## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

DAVID GRIBBLE,            )
                                    )
     Plaintiff,          )
                                    )
     vs.                 )     **Case number 1:14cv0027 TCM**
                                    )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,   )
                                    )
     Defendant.        )

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the application of David Gribble (Plaintiff) for supplemental security income (SSI)

under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the

undersigned Magistrate Judge pursuant to the written consent of the parties. <u>See</u> 28 U.S.C.

§ 636(c).

## Procedural History

Plaintiff applied for SSI in August 2010, alleging he was disabled as of October 8,

2009,[1] by bipolar disorder, depression, anxiety, and a left shoulder problem.[2] (R.[3] at 168-72,

---

[1] Prior applications for SSI and for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. § 401-433, were denied at the initial level on October 7, 2009.

[2] In August 2010, Plaintiff also applied for DIB; however, this application was denied on the grounds that he had not worked long enough to qualify. Plaintiff does not challenge the denial.

[3] References to "R." are to the administrative record filed by the Commissioner with her answer.

189.)  His application was denied initially, on reconsideration, and following a June 2012 video hearing before Administrative Law Judge (ALJ) Thomas Cheffins.  (Id. at 5-18, 68-97, 103-05, 109-11.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Michael Lala, C.R.C.,[4] testified at the administrative hearing.

Plaintiff testified that he was then 45 years old and lives in a one-story house with his mother, sister, brother-in-law, and their three children.  (Id. at 32, 33.)  The household income is from his sister's wages and his mother's fixed income.  (Id. at 35.)  He is 5 feet 8 inches tall and weighs 165 pounds.  (Id. at 33.)  He is right handed.  (Id. at 34.)  He completed the tenth grade and never obtained a General Equivalency Degree (GED).  (Id.)  He completed training as a truck driver, but his commercial driver's license is no longer valid.  (Id.)

Plaintiff stopped working in 2007 due to problems with his shoulders.  (Id. at 36-37.)  He testified that his most serious health problems currently are the herniated disc in his neck, pain in his shoulders, and shortness of breath.  (Id. at 37.)

The longest job Plaintiff has held was doing auto body work.  (Id.)  He cannot remember how long he held that job, but it was full-time work.  (Id. at 38.)  He was "pretty sure" it lasted longer than six months.  (Id.)  This job required that he grind out welds, put body filler in, prime, and prep all the doors on ambulances.  (Id. at 62-63.)

---

[4]Certified Rehabilitation Counselor.

Plaintiff was incarcerated from 2000 to 2004 for child support. (Id. at 37, 56.) He was also incarcerated in the late 80s or early 90s for burglary and stolen property. (Id. at 57.)

Plaintiff has received no medical care since moving to Missouri because he just recently got his Medicaid coverage switched from Ohio to Missouri and had to have his medical records sent from Ohio. (Id. at 39, 41-42.) He moved to Missouri after his mother became sick.[5] (Id. at 43.) He now has Medicaid and has appointments for both his physical and mental health. (Id.) He was also going to have restarted the medication that he had been placed on when in an Ohio psychiatric hospital in July 2011. (Id. at 42-43.) He thought he had been out of his medications for six or seven months. (Id. at 44.)

To try to relieve his shoulder and neck pain, he has been taking over-the-counter medications and using heating pads and ice packs. (Id. at 44-45.) He is in constant pain, but the intensity varies with the weather. (Id. at 45.) He had surgery on his left shoulder, but it did not help. (Id. at 53.)

Asked about how he spends his day, Plaintiff explained that he does not do a lot. (Id. at 46.) He might see friends. (Id.) He does not do a lot of walking because he gets short of breath. (Id. at 46, 47.) He tries to avoid lifting anything because he does not want to hurt his shoulders and neck. (Id. at 46.) On a good day, he cannot stand for longer than thirty minutes before having to sit down and lean back. (Id. at 48.) He cannot sit comfortably for a long period of time, even in a padded office chair. (Id. at 49.) He cannot raise his arms far

_____

[5]This was in August 2011. (Id. at 225.)

above his head.  (<u>Id.</u> at 50.)  His hands become numb, causing him to lose his grip and drop things.  (<u>Id.</u>)  When this happens, he has to rub his hands.  (<u>Id.</u> at 51.)

Also, Plaintiff becomes very nervous and shakes when he is around people.  (<u>Id.</u> at 52.) He is frequently depressed.  (<u>Id.</u> at 53.)

After the ALJ noted that Plaintiff refused to stop smoking, Plaintiff testified that he has "slowed down."  (<u>Id.</u> at 56.)  He has gone from two to three packs of cigarettes a day to five or six cigarettes.  (<u>Id.</u>)  Asked about a reference in an evaluation report to Plaintiff having abstained from drugs for four years and a July 2010 urine drug screen that tested positive for marijuana, Plaintiff was unable to explain the inconsistency.  (<u>Id.</u> at 59.)  Plaintiff did remember telling a doctor in July 2011 that he was using alcohol and cocaine again.  (<u>Id.</u> at 60.)  He was going through a rough time then.  (<u>Id.</u>)  Now, he only occasionally has a beer and does not use cocaine or marijuana.  (<u>Id.</u>)

Mr. Lala, testifying without objection as a vocational expert (VE), classified Plaintiff's past job as an auto body worker helper as medium, unskilled and with a specific vocational preparation (SVP) level of two.  (<u>Id.</u> at 62.)  The *Dictionary of Occupational Titles* (DOT) number is 807.687-010.  (<u>Id.</u>)

He was then asked to assume a claimant of Plaintiff's age, education, and past work experience who can perform work at the medium exertional level with additional limitations of not climbing ladders, ropes, or scaffolds; occasionally reaching overhead with the left upper extremity; and being restricted to work involving simple to moderately complex tasks

with occasional interaction with coworkers and the public.  (Id. at 63.)  The VE replied that this claimant can perform Plaintiff's past relevant work.  (Id. at 64.)

If the hypothetical claimant is limited to work at the light exertional level but has the other limitations of the first hypothetical, the claimant cannot perform Plaintiff's past relevant work.  (Id.)  This person can, however, work as a plastic hospital products assembler, bench assembler, or agricultural bench assembler.  (Id. at 65.)  If the hypothetical claimant's non-exertional limitations are restrictions to work involving only simple routine and repetitive tasks and the other descriptions remained, this claimant will be able to perform these three jobs.  (Id.)

The VE further stated that his testimony is consistent with the DOT and with his training, education, and experience in the field.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of his physical and mental abilities.

When applying for SSI, Plaintiff completed a Disability Report, stating that he had stopped working on June 1, 2007, because of his condition.  (Id. at 189.)  He had a job in 2005 doing auto body work for eight hours a day, five days a week.  (Id. at 190.)  His earnings for that job totaled $8,351.  (Id.)  He did not otherwise describe the work.

On a Function Report, Plaintiff described his daily activities as including fixing lunch, watching television, playing with his children, and visiting with friends.  (Id. at 254.)  His

pain interferes with his sleep. (Id.) He needs to be reminded of appointments and to take his medications. (Id. at 255.) He has no problem with taking care of his personal hygiene. (Id.) He can pay bills, count change, and handle a savings account. (Id. at 257.) His impairments adversely affect his abilities to lift, understand, remember, walk, reach, and concentrate. (Id. at 258.) They do not affect his abilities to, among other things, stand, sit, use his hands, or complete tasks. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with those of the Ohio Department of Rehabilitation and Correction.

When undergoing a mental health evaluation in January 2000, Plaintiff complained of high stress, sleeplessness, and restlessness since arrival at the correctional institution one month earlier to serve a sentence imposed on a guilty plea to burglary. (Id. at 281-83, 409-11, 433.) He was worried about his pregnant fiancé and was not sure he needed mental health services. (Id.) He started drinking at 14 and drank heavily from 27 to 31. (Id.) He smoked approximately one ounce of marijuana a week, and estimated this to be 40 to 50 joints. (Id.) He had used cocaine and acid, but not a lot and not for the past year. (Id.) The psychologist, George E. North, Ph.D., diagnosed Plaintiff with dysthymia and personality disorder. (Id. at

282.)  His current Global Assessment of Functioning (GAF) was 55.[6]  (Id. at 283.)  A psychiatric consultation was recommended.  (Id. at 433.)

The following month, Plaintiff referred himself for mental health services for complaints of insomnia, feelings of depression, and decreased concentration and energy.  (Id. at 464-65.)  He was diagnosed with an adjustment disorder, depressed mood, and dysthmic disorder and prescribed Paxil.  (Id. at 463.)

In March, Plaintiff was prescribed clonidine (for high blood pressure) and Remeron (an antidepressant).  (Id. at 336-49.)  His current GAF was in the 61 to 70 range.[7]  (Id. at 425.)  In September, Plaintiff complained of being on edge and not sleeping well.  (Id. at 447.)  His Remeron was increased.  (Id.)  In December, he was doing okay; his depression was stable and he had been off medications for two weeks.  (Id. at 441-42.)

In January 2001, Plaintiff admitted he was noncompliant with his medication and stated he did not feel like he needed it anymore.  (Id. at 439-40.)  He appeared to be stable.  (Id. at 439.)  His name was removed from mental health caseload.  (Id.)  In March, Plaintiff requested to be placed back on the mental health caseload as he was having difficulties with

---

[6]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[7]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

mood and sleep and with getting along with others.  (Id. at 431.)  He was not referred to a psychologist because he walked out of the room during the interview without explanation, his need for services seemed marginal, and his past medication compliance was not very good.  (Id. at 431, 435.)  In August, Plaintiff reportedly was not getting depressed, not having trouble with inmates or staff, and not having personal problems.  (Id. at 430.)

Throughout his incarceration, Plaintiff was prescribed Motrin and Midrin for migraines.  (See id. at 273-80, 285-91, 295-97.)

When released, in October 2002, Plaintiff was taking no medications and reportedly had no current medical problems.  (Id. at 272.)

Plaintiff was again incarcerated in February 2004.  (Id. at 379-80.)  On a medical screening form, his list of current health problems included only migraines and pain in his left shoulder.  (Id.)  He had an IQ score of 102 on a GAMA test.[8]  (Id. at 491, 494.)  During his confinement, Plaintiff was diagnosed with migraine headaches, which were treated with ibuprofen and Midrin.  (Id. at 360-65.)  He was released in June 2004.  (Id. at 371.)

In February 2006, Plaintiff went to the Paulding County Hospital (PCH) emergency room for complaints of a migraine headache for the past three days accompanied by nausea and some light sensitivity and unrelieved by Tylenol.  (Id. at 919-20.)  The pain was a ten on a ten-point scale.  (Id. at 919.)  After being given Toradol (a nonsteroidal anti-inflammatory

---

[8]"The General Ability Measure for Adults (GAMA) is a brief, self-administered, nonverbal measure of intelligence . . . .  It . . . is most appropriate when a quick estimate of general cognitive ability is needed; . . . e.g., with prison or military populations."  Jack A. Naglierei, Ph.D., and Achilles N. Bardos, Ph.D. GAMA, http://www.unco.edu/cebs/schoolpsych/faculty/bardos/gama.html (last visited Feb. 24, 2015).

drug (NSAID)), Phenergan (an antihistamine), and Nubain (an opioid pain medication), his pain was reduced to a four or five and he was discharged home.  (Id. at 920.)

Plaintiff returned to the PCH emergency room on April 29 after having left-sided chest pain for the past hour.  (Id. at 557-61, 870-72, 921-28.)  The pain was a ten on a ten-point scale.  (Id. at 559.)  He was noted to be in severe distress.  (Id.)  On examination, he had a regular rate and rhythm to his heart and no murmurs, gallops, or rubs.  (Id. at 560.)  He was placed on oxygen and given intravenous drugs to help with his hyperventilation and breathing.  (Id.)  An electrocardiogram (EKG) showed a normal sinus rhythm with a baseline variation caused by Plaintiff's shaking.  (Id.)  A cardiac profile was normal; a chest x-ray showed no acute disease.  (Id.)  Another EKG was later given, showing sinus bradycardia with no ischemic changes.  (Id.)  Plaintiff was admitted for observation, and then left against medical advice.  (Id. at 560-61, 923.)

He returned, however, the next day.  (Id. at 929-35.)  His pain was primarily in the epigastric region and lower substernal area.  (Id. at 929.)  It did not radiate, but was a ten. (Id.)  He had a normal EKG and negative lab work, urine drug screen, and urinalysis.  (Id. at 929, 932-35.)  He was given Lidocaine, Maalox, Demerol, and Phenergan and discharged home with prescriptions for Zantac and with instructions to also take over-the-counter Maalox and to see his primary care physician in one week.  (Id. at 930-31.)

Plaintiff was seen in July at the emergency room of Van Wert County Hospital for complaints of pain in his left eye after being hit in the face with carpet as he was moving it. (Id. at 504-11.)  He was diagnosed with an acute corneal abrasion to his left eye, treated with

eye drops, and discharged with a prescription for Vicodin (a combination of acetaminophen and hydrocodone).  (Id. at 507.)

In January 2007, Plaintiff was seen at the PCH emergency room for complaints of left shoulder pain after being struck with a beam the night before.  (Id. at 795, 936-38.)  He was tender over the upper and posterior portion of the shoulder and held his left arm against his chest.  (Id. at 936.)  X-rays taken of Plaintiff's left shoulder were negative.  (Id. at 795, 938.)  X-rays taken of his cervical spine showed degenerative changes.  (Id. at 795.)  He was diagnosed with a contusion of the left shoulder; given prescriptions for Toradol, Aleve (a NSAID), and Darvocet[9]; and told to alternate the application of ice and heat to the shoulder and to return in four days.  (Id. at 936-37.)  Plaintiff did return, reporting that the Darvocet was not working.  (Id. at 939-41.)  He was not taking the Aleve, as he had been instructed. (Id. at 939.)  He had a weak grip in his left hand and described some numbness and tingling in the fingers.  (Id.)  A magnetic resonance imaging (MRI) of the shoulder was scheduled. (Id.)  If positive, Plaintiff was to be referred to an orthopedic doctor.  (Id.)  His diagnosis was left brachial neuritis and contusion of the left shoulder.  (Id. at 940.)

The MRI, taken the next day, revealed arthritic changes of the acromioclavicular (AC) joint with capsular hypertrophy and inflammatory edema infiltrating the bony structures about the joint margins and rotator cuff tendonitis with possible subtle partial thickness intrasubstance tear supraspinatous.  (Id. at 942.)

---

[9]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Feb. 11, 2015). It was withdrawn from the United States market in November 2010.  Id.

Plaintiff was admitted on March 14 to Defiance Regional Medical Center (DRMC) after going to the emergency room with complaints of increasing depression and passive suicidal thoughts. (Id. at 512-19, 636-48, 708-20, 1062-63.) Lately, he had been drinking until he passed out. (Id. at 515.) He had an eight-year old child and a seventeen-year old daughter. (Id.) On admission, he had "marked psychomotor retardation," poor eye contact, a monotone and slow speech, a flat affect, an "intensively depressed" mood, and guarded insight and judgment. (Id. at 513.) He was oriented to time, place, and person. (Id.) He could recall past and present events. (Id.) He had no hallucinations or delusions. (Id.) His intelligence seemed average. (Id.) He felt hopeless, worthless, and guilty. (Id.) He had little energy and a poor appetite. He was diagnosed by the admitting psychiatrist, Melchor Mercado, M.D., with bipolar disorder, not otherwise specified, rule out major depressive disorder, alcohol abuse, and rule out substance induced mood disorder. (Id.) His GAF was 40.[10] (Id.) He was started on lithium (an antidepressant) and Lamictal (an anticonvulsant). (Id.) The lithium dosage was later increased. (Id. at 512.) The next day, he was quiet, calm, and had fair eye contact. (Id. at 516.) A recreational therapy assessment listed his hobbies as working on cars and doing carpentry work. (Id. at 1062.) Later in the day, he developed a headache and was given Darvocet. (Id. at 517.) He slept without interruption. (Id. at 518.) On March 16, he requested to be discharged so he could return to his job as a maintenance worker. (Id. at 512.) He was to be followed up at the Maumee Valley Guidance Center;

---

[10]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

however, this required a Defiance County address and he did not have one. (<u>Id.</u> at 512, 518.)

He declined to go to the Paulding County Mental Health Center and could not afford to pay

full price at Maumee. (<u>Id.</u> at 518-19.) Consequently, he was discharged without follow-up.

(<u>Id.</u> at 519.)

Complaining of abdominal and epigastric pain after taking three Advil the night

before, Plaintiff went to the PCH emergency room on May 26. (<u>Id.</u> at 943-47.) He had a full

range of motion in his extremities and normal x-rays of the chest and abdomen. (<u>Id.</u> at 944,

947.) He was given Maalox, Lidocaine, and Donnatal (a barbiturate); diagnosed with acute

gastritis, secondary to Advil; and advised to take Maalox and Pepcid. (<u>Id.</u> at 944.)

In October, Plaintiff consulted Bryan D. Kaplansky, M.D., for complaints of left

shoulder girdle pain. (<u>Id.</u> at 587-88, 898-99.) The pain had begun three years earlier

following a truck wreck and had been recently exacerbated at work. (<u>Id.</u> at 587.) The pain

radiated to his hand and fingers. (<u>Id.</u>) He also had neck pain, which was mild. (<u>Id.</u>) This

pain was aggravated by shoulder motion. (<u>Id.</u>) On examination, Plaintiff had a normal gait,

balance, and coordination. (<u>Id.</u>) There was no asymmetry of his upper limbs and no atrophy.

(<u>Id.</u>) There was diffuse hypoesthesia (reduced sense of touch or sensation) in his left upper

limb. (<u>Id.</u>) He had a positive Spurling's maneuver on the left and not on the right.[11] (<u>Id.</u> at

588.) Plaintiff's shoulder motion was restricted in all planes. (<u>Id.</u>) Also, there was

"considerate subacromial tenderness on the left" and "milder bicipital tendon tenderness."

_____

[11]The Spurling's maneuver, or test, is for the evaluation of cervical nerve root impingement and is considered positive when the maneuver elicits typical radicular arm pain. <u>Spurling Test</u>, http://www.medilexicon.com/medicaldictionary.php?t=90833 (last visited Feb. 19, 2015).

(Id.)  Plaintiff was diagnosed with left sided rotator cuff tendinopathy and left cervical radiculopathy.  (Id.)  He was given a steroid injection without complications and a prescription for Lodine (an NSAID).  (Id.)  Dr. Kaplansky recommended cervical spine x-rays and an MRI; however, Plaintiff deferred a decision because he was not currently working and was without insurance.  (Id.)

Plaintiff returned to Dr. Kaplansky in January 2008, reporting that the shoulder injection had only partially helped.  (Id. at 589, 900.)  Plaintiff could not afford the Lodine.  (Id.)  He had tried to return to work, but was prevented from doing so by the shoulder pain.  (Id.)  On examination, he was as before.  (Id.)  His options were discussed.  (Id.)

X-rays of his lumbar spine taken on February 2 to investigate his complaints of chronic back pain revealed moderate diffuse spondylosis but were otherwise negative.  (Id. at 584, 895.)  X-rays of his left shoulder were within normal limits.  (Id. at 585, 896.)

On February 19, Plaintiff complained to Dr. Kaplansky of a painful range of motion in his left shoulder in all planes.  (Id. at 590, 901.)  An MRI was still desired, and Plaintiff was to investigate getting on Medicaid as soon as possible.  (Id.)

Plaintiff was seen at the PCH emergency room on March 20 for complaints of an intermittent headache for the past week that was worse that day and was accompanied by vomiting, lightheadedness, and dizziness.  (Id. at 948-52.)  He was diagnosed with migraines; given Toradol, Phenergan, and Nubain; and discharged with instructions to follow up with his primary care physician in one or two days if he did not improve.  (Id. at 950, 952.)

When seen again at the PCH emergency room on July 2 for a possible infection, Plaintiff complained of a headache and of pain in his right hip that radiated up to his back. (Id. at 953-58.)  He walked with a limp.  (Id. at 953.)  X-rays of his lumbar spine showed mild degenerative joint disease.  (Id. at 958.)

Plaintiff returned to the emergency room five days later for treatment of a migraine headache.  (Id. at 959-63.)  He was treated with medication and discharged home in fair condition.  (Id. at 961, 963.)

Plaintiff consulted Wendell Spangler, M.D., on November 10 to establish a primary care relationship for treatment of his left shoulder and neck pain.  (Id. at 551-52, 825-26.) He explained that the pain had begun four or five years earlier following a motor vehicle accident.  (Id. at 552.)  Heat sometimes helped; Vicodin, Flexeril, and NSAIDs did not help. (Id.)  His medical records were to be obtained.  (Id.)  X-rays taken five days later of his left clavicle and left shoulder were normal.  (Id. at 619, 795, 966.)  X-rays of his cervical spine showed degenerative changes.  (Id. at 619.)

Nine days later, Plaintiff saw Dr. Spangler to request a work release slip until his left shoulder problem had resolved.  (Id. at 550, 824.)  It was noted that he worked construction, lifting, building walls, and hanging drywall.  (Id.)  He was given a work release until he saw an orthopedic doctor.  (Id.)

On December 10, Plaintiff reported to Dr. Spangler that Darvocet and Flexeril did not really help.  (Id. at 550, 824.)  He was prescribed Percocet.  (Id.)

Two days later, Plaintiff consulted Steven P. Haman, M.D., with the Orthopaedic Institute of Ohio, about his severe, sharp left shoulder pain. (Id. at 632-33, 745-46.) He was to have an MRI of his shoulder and then return for a follow-up appointment. (Id. at 633.) The MRI, taken on December 27, revealed tendonopathy with a small amount of fluid in the subacromial/subdeltoid bursa, possibly secondary to bursitis or to tendonopathy, and bone edema and degenerative changes of the AC joint. (Id. at 968.)

On January 20, 2009, Plaintiff consulted Michael J. Muha, M.D., also with the Orthopaedic Institute, about pain in the anterior aspect of his left shoulder for the past five years. (Id. at 528-30.) He explained that he had had a cortisone injection in the shoulder, but it afforded him no relief. (Id. at 528.) The pain interfered with his activity and was provoked by overhead positioning. (Id.) With the exception of showing some arthritic changes of the AC joint, x-rays of the shoulder were negative. (Id.) An MRI of the shoulder revealed "[t]endinopathy with small amount of fluid in the subacromial/subdeltoid bursa" and "[b]one edema and degenerative changes of the AC joint." (Id.) On examination, Plaintiff had a fair posture, non-antalgic gait, supple neck, limited cervical motion, and pain with cervical foraminal closure maneuvers to the left that apparently radiated to the superior aspect of his shoulder. (Id.) There was no swelling or deformity of the shoulder, but there was subacromial tenderness, pain with impingement testing, a little tenderness over the AC joint, and pain with cross arm testing. (Id. at 528-29.) He had a good active range of motion in the left shoulder and a full range of motion and strength in his right shoulder. (Id. at 529.) Dr. Muha diagnosed Plaintiff with shoulder bursitis/tendinitis, cervical degenerative disc disease,

and cervicalgia.  (Id.)  He administered a steroid injection to Plaintiff's left shoulder.  (Id. at 529-30.)  Plaintiff was to follow-up as needed.  (Id. at 530.)

The next day, Plaintiff cancelled his appointment with Dr. Spangler.  (Id. at 549.)  He did not show for the appointment rescheduled for the next week.  (Id.)

Plaintiff returned to Dr. Muha on March 17, reporting that the injection had given him no relief.  (Id. at 526-27, 630-31, 743-44.)  On examination, he was as before.  (Id. at 526.)  He was diagnosed with joint pain in the shoulder and cervical degenerative disc disease.  (Id. at 527.)  He was to be scheduled for an MRI of his cervical spine.  (Id.)

When next seeing Dr. Muha, on May 19, Plaintiff had not yet had the MRI.  (Id. at 524-25, 624-25, 736-37, 740.)  On examination, his left rotator cuff strength was intact, but he had some give way weakness with strength testing.  (Id. at 525.)  Plaintiff requested surgical intervention.  (Id.)  Dr. Muha recommended the MRI before considering surgery.  (Id.)  The MRI of his cervical spine, taken on June 3, showed disc disease primarily at C4-C5 and C5-C6.  (Id. at 621, 797, 969.)

Thirteen days later, Plaintiff saw Dr. Muha.  (Id. at 522-23, 628-29, 741-42.)  On examination, his neck had some mild limitation of motion with cervical foraminal closure maneuvers to the left.  (Id. at 522.)  The remainder of the examination findings were unchanged.  (Id. at 522-23.)  He was diagnosed with cervical degenerative disc disease and shoulder bursitis/tendinitis.  (Id. at 523.)  Dr. Muha informed Plaintiff he was reluctant to recommend surgical intervention as he was not sure it would be of significant benefit.  (Id.)

Plaintiff consulted a neurosurgeon, William Young, M.D., on June 25 for his left shoulder and neck pain. (Id. at 626-27, 911-12.) On examination, he was in no acute distress, had an appropriate mood and affect, and had full motor strength throughout. (Id. at 626.) He had pain with range of motion testing of his left shoulder, but no evidence of atrophy or fasciculation of his extremities. (Id.) Dr. Young opined that Plaintiff's symptoms were a combination of cervical spondylosis and an intrinsic shoulder problem, the latter being the more significant problem. (Id. at 627.) He recommended that Plaintiff have the recommended surgical procedure and then return for a follow-up appointment so any cervical symptoms can be addressed. (Id.)

On September 3, Plaintiff underwent an arthroscopic subacrominal decompression of his left shoulder and arthroscopic left distal clavicle resection. (Id. at 531-32, 576-77, 618, 794, 887-88.)

Nine days later, he went to the PCH emergency room for complaints of pain in his left shoulder and armpit. (Id. at 578-82, 889-93, 971-75.) It was explained that the pain was probably caused by an inflammation caused by having his arm in a sling for several days. (Id. at 582.) He was given an antibiotic, Keflex, and advised to follow up with his primary care physician in two days. (Id. at 580, 582.)

On September 15, Plaintiff reported to Dr. Muha that his shoulder felt different. (Id. at 533-34, 622-23, 734-35, 738-39.) He had gone for his initial physical therapy evaluation and was waiting for insurance to clear him for treatments. (Id. at 533.) He was encouraged to discontinue using the sling and return in four to six weeks. (Id.)

The same day, Plaintiff saw Dr. Spangler for an abscess he had behind his right ear for the past two months.  (Id. at 549, 823.)  He was prescribed an antibiotic.  (Id.)

Plaintiff consulted Brent M. Savage, M.D., on January 5, 2010, about right posterior ear and neck lesions which had been reduced, but not resolved, by antibiotics.  (Id. at 862-63.)  He had a full range of motion in his extremities.  (Id. at 863.)  There were no signs of an active infection and no drainage.  (Id. at 862-63.)  An unspecified surgical procedure was discussed; Plaintiff was to call back with his decision.  (Id.)

On January 18, Plaintiff was treated at the PCH emergency room for a foreign body that got into his left eye when he was working on a car the night before.  (Id. at 569-75, 880-86, 976-80.)

Plaintiff did not show for his February appointment with Dr. Spangler to have lab work done.  (Id. at 549.)

Plaintiff reported to Dr. Spangler on March 8 that the surgery on his left shoulder had not helped and that it was still painful.  (Id. at 548, 822.)  His left arm was weak and he could not hold it up for a long time.  (Id.)  Also, he had neck pain.  (Id.)  Plaintiff was prescribed Percocet and Flexeril and referred to an orthopedist for his neck and shoulder pain.  (Id.)

Plaintiff did not show for his March 24 appointment with Dr. Spangler.  (Id. at 547, 821.)

Plaintiff went to the PCH emergency room on July 11 for complaints of left-sided chest pressure for the past three months that radiated to his left arm and was getting worse.  (Id. at 562-66, 593-96, 608-13, 615-17, 791-93, 873-77, 981-96, 1012-13.)  Also, he had

shortness of breath.  (Id. at 562.)  Chest x-rays and an ECG were normal with the exception of showing chronic bronchitis and possible early pneumonia.  (Id. at 567, 608-13, 615-17, 654-55, 791-93.)  A drug screen was positive for marijuana.  (Id. at 595.)  He had no relief from Toradol, but did have relief from Nubain and Phenergan.  (Id. at 562.)

The next day, Plaintiff went to the emergency room at DRMC, complaining of left rib pain for at least the past month; chest pain, weakness, and dizziness for the past ten days; and left arm numbness.  (Id. at 567-68, 652-58, 701-07, 769-70, 784-85, 788-89, 878-79.)  A review of his systems was negative with the exception of the left rib pain.  (Id. at 567-68.)  Chest x-rays revealed chronic bronchitis and possible early pneumonia.  (Id. at 654, 706.)  An EKG was normal except for sinus bradycardia.  (Id. at 769-70, 784-85.)  Plaintiff was diagnosed with costochondritis (an inflammation of the cartilage that connects a rib to the breastbone) and discharged with instructions to see his primary care physician in two or three days.  (Id. at 568.)

Two days later, Plaintiff saw Dr. Spangler.  (Id. at 546, 605-07, 781-83, 790, 820, 997-99.)  Computed tomography (CT) scans of his chest for pulmonary embolism were negative.  (Id. at 605, 607, 781, 783, 999.)  CT scans of his abdomen were also negative.  (Id. at 605-07, 782, 999.)  He was to have his cholesterol levels checked and return the next day.  (Id. at 546.)  Plaintiff did return, reporting that he was still having left-sided chest pain.  (Id. at 545, 819.)  He was told to follow-up with the doctor who did the surgery for his complaints of tingling in his right arm and pain in his left shoulder.  (Id.)  Six days later, Dr. Spangler referred Plaintiff to a cardiologist.  (Id. at 544, 818.)

Plaintiff was seen on July 26 for a cardiovascular evaluation by Farrukh Khan, M.D. (Id. at 667-69, 692-94, 697, 767-68, 906-10.)  Chest x-rays showed chronic bronchitis.  (Id. at 649, 698.)  An EKG was normal except for sinus bradycardia.  (Id. at 767-69.)  The next day, Plaintiff had a cardiac catherization by Dr. Khan for an investigation of his "rather typical symptoms for myocardial ischemia."  (Id. at 600-01, 665-66, 695-96, 771-73, 776-77.)  The catherization revealed "[n]o angiographic evidence of atherovascular coronary artery heart disease" and "[p]reserved systolic and mildly elevated diastolic pressure."  (Id. at 600.)  The only recommendation was "[o]ptimization of the medical regimen."  (Id.)

Plaintiff went to the DRMC emergency room on July 28 for complaints of right groin and intermittent left-sided chest pain.  (Id. at 553-56, 602-04, 659-64, 671-76, 680-91, 778-80, 864-67.)  He reported that the Percocet he had taken in 2009 had helped with his symptoms, but he had taken the last Percocet he had available.  (Id. at 555.)  On examination, Plaintiff was in no acute distress.  (Id.)  Other than a "small well healing puncture" in his right groin and a minimal amount of ecchymosis (a small hemorrhagic spot in the skin), the examination findings were normal.  (Id.)  CT scans of his chest, abdomen, and pelvis showed no infection.  (Id. at 555, 602-04, 659-60, 673-76, 685-91, 778-80.)  Plaintiff was given a prescription for Percocet, instructed to follow-up with his primary care physician in two or three days, and discharged "in good and improved condition."  (Id. at 556.)  A mammogram taken the next day showed larger pectoral muscles on the left than on the right but was otherwise normal.  (Id. at 599, 775, 1000.)

In August, Plaintiff reported to Dr. Spangler that he had had a heart catherization and was still tender and bruised at the site where the catheter was inserted.  (Id. at 543, 817.)

An echocardiograph performed on September 2 showed normal valvular morphology, normal cardiac chamber dimensions, and atypical septal motion and overall preserved left ventricular systolic function with an ejection fraction of 55 to 60 percent.  (Id. at 634, 861, 1001.)

Plaintiff went to the PCH emergency room on September 11 for complaints of migraine headaches that were an eight on a ten-point scale.  (Id. at 854-60, 1002-06.) Plaintiff was given Toradol, Phenergan, and Nubain.  (Id. at 856.)  His pain diminished to a five and he was discharged.  (Id. at 855, 860.)  The next day, Plaintiff returned to the emergency room.  (Id. at 848-53, 1007-11.)  He was again given medications and discharged. (Id. at 850.)

On October 1, Plaintiff saw Dr. Spangler for complaints of chest pain and shortness of breath.  (Id. at 816.)  His heart had a regular rate and rhythm.  (Id.)  He was prescribed Percocet and was told to reduce his smoking.  (Id.)

Chest x-rays taken on October 12 revealed no acute cardiopulmonary abnormality and mildly hyperexpanded lungs.  (Id. at 774.)  Chest x-rays taken on October 29 to investigate Plaintiff's complaints of a cough and chronic obstructive pulmonary disease (COPD) revealed a stable chest with mild hyperinflation.  (Id. at 765-66, 815.)

At the request of Dr. Spangler, Plaintiff returned to Dr. Muha in November for an evaluation of his left shoulder and chest wall pain.  (Id. at 731-33, 903-05.)  Dr. Muha noted

that Plaintiff had failed to return for a follow-up after being seen only once postoperatively. (Id. at 731.) On examination, Plaintiff had no muscular atrophy or spasm in his left shoulder, but did have full motion, strength, and stability. (Id.) Although his pectoral muscle was larger on the left, he had no tenderness over the muscle and no pain with resisted adduction. (Id. at 732.) Dr. Muha diagnosed Plaintiff with cervical degenerative disc disease and referred him back to Dr. Spangler for consideration of further cervical treatment, including a cervical spine surgeon. (Id.)

A pulmonary function study performed on November 30 was normal. (Id. at 799-800, 1014-16.)

When seen by Dr. Spangler on December 10, Plaintiff was prescribed Percocet, to be taken every hour as needed. (Id. at 541.) Five days later, Plaintiff complained to Dr. Spangler of chest pain and pressure. (Id. at 813.) He was diagnosed with COPD and told to reduce his smoking. (Id.)

On December 31, Plaintiff was seen at the PCH emergency room for complaints of chest pain that was a nine on a ten-point scale. (Id. at 760-62, 843-47, 1017-26.) A chest x-ray showed no active pulmonary disease. (Id. at 761, 1026.) An EKG was normal. (Id. at 760, 762, 1024-25.) Plaintiff was diagnosed with costochrondritis and atypical chest pain and discharged with a prescription for a pain reliever. (Id. at 847.)

The next day, January 1, 2011, Plaintiff went to the emergency room at DRMC for abdominal cramping and diarrhea. (Id. at 827-29, 835-42, 1065-73.) His past medical history was significant for asthma and chest pains. (Id. at 829.) He did not have a fever but did have

the shakes and chills.  (Id.)  He was diagnosed with a perirectal cyst or abscess, prescribed a stool softener and Cipro (an antibiotic), and was to follow up with a Dr. Sayre.  (Id. at 829, 835-36.)

On January 2, Plaintiff went to the emergency room at PCH.  (Id. at 830-34, 1027-32.)  He was told to stop the Cipro and was prescribed two other antibiotics instead.  (Id. at 834.)

The following day, January 3, he consulted Peter vanden Berg, M.D., about the abscess.  (Id. at 902.)  Dr. Berg opined that the abscess would heal within two weeks.  (Id.)  If it did not, Plaintiff was to return.  (Id.)

Plaintiff reported to Dr. Spangler on January 26 that the Percocet helped take the edge off his pain.  (Id. at 812.)  He further reported that he had had a cough and some wheezing the past week.  (Id.)  He used Albuterol every day.  (Id.)  Plaintiff was diagnosed with emphysema and prescribed Advair Diskus in addition to the Percocet.  (Id.)  He was to return in two months or sooner if needed.  (Id.)

In February, Plaintiff consulted Frank E. Furmich, M.D., with the Orthopaedic Institute, for complaints of neck and left arm pain.  (Id. at 728-30.)  He reported that his pain was aggravated by walking, prolonged sitting, and moving his neck.  (Id. at 728.)  He had to change positions frequently.  (Id.)  And, he had difficulties with activities of daily living because of the pain.  (Id.)  His neck pain was an average of four on a ten-point scale and was a six at its worst.  (Id.)  His arm pain was an average of six and a nine at its worst.  (Id.)  On examination, he was in no acute distress, walked with a non-antalgic and non-ataxic gait, and had no loss of muscle tone or strength in his upper extremities.  (Id. at 728-29.)  He had 4/5

strength on the left with resisted grip and 5/5 on the right. (<u>Id.</u> at 729.) He had a full range of motion and flexion and extension as well as lateral bending. (<u>Id.</u>) He was diagnosed with cervical spondyloarthritis, displacement of cervical intervertebral disc without myelopathy, and cervical radiculitis. (<u>Id.</u>) He was to participate in physical therapy and use over-the-counter anti-inflammatories – both prerequisites for insurance approval of the MRI that Dr. Fumich wanted him to have. (<u>Id.</u>) He was given a note to be off work until a follow-up evaluation. (<u>Id.</u>)

Plaintiff was seen on March 2 at the PCH emergency room after hurting his left hip and back. (<u>Id.</u> at 801-10, 1033-38.) Also, he had tingling in his left legs. (<u>Id.</u> at 802.) On examination, he had a limited ability to bear weight and a limited range of motion in his left hip. (<u>Id.</u> at 805.) X-rays of Plaintiff's left hip and of his lumbar spine were all normal with the exception of showing mild degenerative changes. (<u>Id.</u> at 801, 1038.) Plaintiff was given morphine and Phenergan, diagnosed with lumbosacral strain, and discharged with a prescription for Percocet. (<u>Id.</u> at 804, 806, 808-10.)

Two days later, on Dr. Fumich's referral, Plaintiff was evaluated for physical therapy. (<u>Id.</u> at 1044-46.) Plaintiff complained of increasing pain in the left side of his neck that radiated to the left shoulder and upper extremity; of pain over his cervical spine that radiated down into his scapular area, shoulder, and chest; and of a decreased range of motion in his neck, which caused him difficulties sleeping. (<u>Id.</u> at 1044.) On examination, Plaintiff's active range of motion in his upper extremities was within normal limits but his cervical range of motion was diminished. (<u>Id.</u>) His deep tendon reflexes and his left grip strength were also

diminished.  (Id. at 1045.)  His posture was poor.  (Id.)  Short term goals of physical therapy included the decrease of Plaintiff's cervical pain to a five with activities of daily living and the increase of his cervical range of motion to within normal limits for those activities.  (Id.) He was to be seen twice a week for six weeks.  (Id.)  He had a session that day.  (Id.)  He could not keep his next session, but did keep the following two, on March 22 and March 24. (Id. at 1041, 1042.)  He was a "no show" for the next session and cancelled the one following. (Id. at 1041.)  His last physical therapy session was on April 4.  (Id. at 1092.)  His cervical spine and left shoulder pain were a five to six and he had made progress on his goals and was independent with his home exercise program.  (Id.)  Because no other sessions were scheduled, he was discharged from physical therapy.  (Id.)

Three days after his last physical therapy session, Plaintiff saw Dr. Fumich.  (Id. at 1098-99.)  In addition to continuing neck and left arm pain, Plaintiff had numbness and tingling in his right arm, resulting in him dropping things and having difficulty with fine motor tasks.  (Id. at 1098.)  His symptoms were worse when he used his arms and better when he rested.  (Id.)  On examination, "[h]is hand grip, finger extension, wrist extension, elbow flexion and extension [were] fully maintained throughout grade 5/5 with the exception of his left hand grip, which was maintained at 4/5."  (Id.)  He was to have a cervical MRI.  (Id.)  Dr. Fumich gave Plaintiff an "off work slip" with a start date of February 24, 2011, to May 2, 2011, "due to cervical spine and further work-up."  (Id.)

The MRI, performed on April 28, revealed "a two-level cervical spondylosis and stenosis condition of the level C4-C5 and C5-C6 producing deformation of the cervical spinal

cord," worse on the left than on the right. (Id. at 1094, 1096-97.) Seeing Dr. Fumich the same day, Plaintiff reported that the physical therapy was of no use. (Id. at 1094-95.) Dr. Fumich diagnosed Plaintiff with displacement of cervical intervertebral disc without myelopathy and cervical radiculitis. (Id. at 1094.) Plaintiff was to consider an anterior cervical disc fusion at C5-C6 and C6-C7. (Id. at 1095.) He was "very motivated to avoid" the surgery and wanted to think about his options. (Id.) Dr. Fumich gave Plaintiff an "off work slip" with a start date of May 17 and an estimated return to work date of August 29 "due to cervical spine and surgery." (Id. at 1094.)

Plaintiff was admitted to PCH on July 9 after a friend responded to a message he had left and found him to have garbled speech. (Id. at 1074-91.) He had apparently overdosed on Ambien, Xanax, Flexeril, and Percocet. (Id. at 1075.) On admission, he tested positive for benzodiazepine, cocaine, and marijuana. (Id. at 1088.) The next day, he rested in bed and denied any suicidal ideation. (Id. at 1074, 1082.) After his wife expressed concern that he might attempt suicide again if he went home, Plaintiff was transferred and voluntarily admitted on July 10 to the Northwest Ohio Psychiatric Hospital. (Id. at 1050-61, 1074.) He had had a relapse of alcohol abuse and had overdosed on prescription medication. (Id. at 1052.) Plaintiff reported that his marriage had deteriorated due to his chronic pain and inability to work. (Id.) Before his overdose, he had been depressed, had difficulty sleeping, and had a decreased appetite and energy. (Id. at 1054.) He had done construction work, but could no longer due to his constant shoulder pain. (Id. at 1055.) He dropped out of school in the eleventh grade because he did not like school, was always in trouble, and was into

drugs.  (Id.)  He had been in special education classes.  (Id.)  He smoked one pack of cigarettes a day, and had since he was fourteen.  (Id.)  He had been a heavy drinker, but had stopped until two or three weeks earlier.  (Id.)  He smoked marijuana daily to help relieve his pain.  (Id.)  He reported that he had problems with his memory, and they were getting worse.  (Id. at 1056.)  He took Percocet to try to relieve his pain.  (Id.)  On examination, he appeared to be in pain.  (Id.)  His speech was normal in rate, tone, and volume and was logical and not pressured.  (Id.)  His mood was worried, scared, and anxious.  (Id.)  He did not have any current suicidal ideation or any hallucinations.  (Id.)  He was oriented to place, time, person, and situation.  (Id.)  His attention was good; his intelligence was low average; his insight was fair; his judgment showed a lack of ability to cope and the tendency to use alcohol and acting out to ask for help.  (Id. at 1056-57.)  He was diagnosed with mood disorder, not otherwise specified, and bipolar versus unipolar with substance abuse exacerbation.  (Id. at 1057.)

The next day, Plaintiff had a physical examination.  (Id. at 1059-61.)  Plaintiff reported that his current medications included Percocet, ProAir inhaler for COPD, Spiriva, and Advair Diskus.  (Id. at 1059.)  He used a nicotine patch to help him stop smoking.  (Id.)  He had a full range of motion in all joints with no cyanosis, clubbing, or edema.  (Id. at 1060.)  He was in some distress due to chronic neck pain.  (Id.)  His gait and sensory function to pinprick and soft touch were intact.  (Id. at 1061.)  He had good motor strength in his upper and lower extremities and equal deep tendon reflexes.  (Id.)  He was to be maintained on his medications until lab work was done.  (Id.)

Also before the ALJ was the reports of non-examining and examining consultants.

At the initial level, Leon D. Hughes, M.D., and Irma Johnston, Psy.D., reviewed the medical evidence to date, including the report of Dr. Ward,[12] see pages 29 to 30, infra, and the forms completed as part of the application process. (Id. at 68-81.) It was opined that Plaintiff had non-severe dysfunction of his major joints, severe anxiety and affective disorders, and non-severe substance addiction disorder. (Id. at 75.) His mental impairments resulted in moderate restrictions in his activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id.) They had not caused him repeated episodes of decompensation. (Id.) Dr. Johnston noted that Plaintiff reported he does not drive, but drove to the consultative exam; reported he had no permanent address, but lived with his family; and reported a history of special education services, but had a GAMA in the average range and no documentary support for the services. (Id. at 76.) She concluded that Plaintiff has the capacity to understand and recall instructions for simple to moderately complex tasks. (Id. at 77.) Plaintiff's ability to maintain attention and concentration for extended periods and his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were moderately limited. (Id.) His ability to carry out detailed instructions was not significantly limited. (Id.) His ability to work in coordination with or in proximity to others without being distracted by them, to interact with the general public, and to complete a normal workweek and workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately

---

[12]The source of this report is identified as Paul Deardorff, Ph.D. Dr. Ward is the psychologist who authored the report. He is in Dr. Deardorff's practice.

limited.  (Id. at 78.)  His ability to respond appropriately to changes in the work setting was also moderately limited.  (Id.)  He had no past relevant work.  (Id. at 79, 80.)  It was concluded that Plaintiff was not disabled.  (Id. at 81.)

Caroline Lewin, Ph.D., and Eli Perencevich, D.O., came to similar conclusions when reviewing the record pursuant to Plaintiff's request for reconsideration.  (Id. at 83-96.)

In November 2010, Christopher C. Ward, Ph.D., a licensed psychologist, performed a psychological evaluation of Plaintiff.  (Id. at 721-25.)  Plaintiff reported that he was married, lived with his wife and four children, and did not work because of shoulder problems and being nervous around people.  (Id. at 721.)  He had completed the ninth grade and had received special education services.  (Id. at 722.)  He was a "loner" in school and had been suspended multiple times for fighting and violating the rules.  (Id.)  He had been  expelled.  (Id.)  As an adult, he spent six years in prison for burglary and failure to pay child support.  (Id.)  He had a history of alcohol abuse and cocaine dependence, but had been sober for four years.  (Id.)  In addition to shoulder pain, he had chest pains, breathing problems, and migraine headaches.  (Id.)  He was not taking any prescription medications.  (Id.)  He has not worked since 2006, and has never steadily worked.  (Id.)  On examination, he was difficult to establish rapport with, but did not appear to exaggerate or minimize his difficulties.  (Id.)  His speech was within normal limits and was without loose associations or flight of ideas.  (Id. at 723.)  His mood was anxious and withdrawn; his affect was flat; his facial expression was downcast.  (Id.)  He had limited eye contact.  (Id.)  He reported having symptoms of depression, racing thoughts, and paranoia during the past year.  (Id.)  He also reported having

feelings of boredom and anger. (Id.) He did not have any suicidal or homicidal ideation. (Id.) He was alert and oriented to time, place, person, and situation. (Id.) His remote recall was adequate; his short-term memory was below average. (Id.) His attention and concentration skills were limited. (Id.) His arithmetic and abstract reasoning abilities were below average. (Id.) His intelligence level seemed to be between the borderline and low average range. (Id.) Plaintiff reported that he had a few friends and regular contact with family. (Id. at 724.) His activities of daily living included providing "some care for his children." (Id.) He did not shop and did limited chores as he was easily frustrated. (Id.) He watched television. (Id.) He had limited motivation and energy. (Id.)

Dr. Ward assessed Plaintiff's presentation as being indicative of problems with his mood and anxiety. (Id.) His ability to relate to others, including fellow workers and supervisors, was moderately impaired by his mental health difficulties. (Id. at 725.) "He would have some difficulty working in groups and with critical feedback, both of which would increase his mental health symptoms." (Id.) Also moderately impaired was his ability to understand, remember, and follow instructions. (Id.) He would have difficulty remembering and understanding simple instructions of more than two steps. (Id.) His ability to maintain attention, concentration, persistence, and pace was moderately impaired and below average. (Id.) "[His] ability to withstand the stress and pressure associated with day-to-day work activity [was] markedly impaired." (Id.) Plaintiff was diagnosed with major depressive disorder, recurrent, anxiety disorder not otherwise specified, and cocaine dependence in remission. (Id. 724.) His current GAF was 50. (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff has not engaged in substantial gainful activity since his application date of August 13, 2010. (<u>Id.</u> at 10.) The ALJ next found that Plaintiff has severe impairments of left shoulder tendinitis, COPD, mild degenerative disc disease, affective disorder, anxiety, and bipolar disorder. (<u>Id.</u>) He does not have an impairment or combination thereof that meets or medically equals an impairment of listing-level severity. (<u>Id.</u>)

Addressing Plaintiff's mental impairments, the ALJ determined that Plaintiff has moderate limitations in his activities of daily living, in social functioning, and in concentration, persistence or pace. (<u>Id.</u> at 11.) His limitation in social functioning is accommodated by restricting him to occasional interaction with the public, coworkers, and supervisors. (<u>Id.</u>) His limitation in concentration, persistence, or pace is accommodated by restricting him to simple, routine, and repetitive tasks. (<u>Id.</u>) Plaintiff has not had any episodes of decompensation of extended duration. (<u>Id.</u> at 12.)

Addressing Plaintiff's residual functional capacity (RFC), the ALJ found he can perform less than a full range of medium work. (<u>Id.</u>) Specifically, he can lift and/or carry twenty-five pounds frequently and fifty pounds occasionally; he can sit, stand, and/or walk for six hours out of an eight-hour workday; he can occasionally reach overhead with his left upper extremity, but is not to climb ladders, ropes, or scaffolds; he is limited to simple, routine, and repetitive tasks; and he can occasionally interact with the public and coworkers (<u>Id.</u>) In reaching this conclusion, the ALJ evaluated Plaintiff's credibility and found it

diminished by at least six considerations.  (Id. at 13-14.)  First, Plaintiff "has engaged in a somewhat normal level of daily activity and interaction," including visiting friends, preparing meals, watching television, playing with his children, cleaning, doing the laundry and shopping, and going out alone.  (Id. at 13.)  The ALJ noted that Plaintiff had reportedly worked on a vehicle in January 2010.  (Id.)  The responses of his father on a Function Report were discounted on the grounds that his father is not a medical professional, but does have a familial interest in seeing his son receive benefits and that his statements are not supported by the medical evidence.[13]  (Id. at 13-14.)  Second, his convictions for receiving stolen property and for theft give him "a reputation for dishonesty" and detract from his credibility.  (Id. at 14.)  Third, his allegations are not supported by the objective medical evidence.  (Id.)  Fourth, he has a poor earnings record and sporadic work history.  (Id.)  Fifth, he is non-compliant with treatment.  (Id.)  For instance, he has COPD but continues to smoke regardless of his doctors' instructions to stop.  (Id.)  Also, he does not follow-up as directed and did not complete physical therapy.  (Id.)  He has misrepresented to the consultative examiner and at the hearing his use of alcohol and illicit substances.  (Id.)  Sixth, he has not received the type of medical treatment that is expected for a totally disabled individual and has instead received routine, conservative, and non-emergency treatment since the alleged disability onset date.  (Id.)

---

[13]The report referred to was a Function Report Adult Third Party completed by Plaintiff's father in September 2010.  Asked how much time he spent with Plaintiff, his father replied, "very little."  (Id. at 202.)  He responded "don't know" to the majority of questions, including about how Plaintiff spent his day, where he lived, what he did, and what he can do.  (Id. at 202-08.)  He explained that he sometimes does not see Plaintiff for months.  (Id. at 909.)

After summarizing the medical evidence, the ALJ gave little weight to the opinion of Dr. Fumich in April 2011 that Plaintiff can return to work the following month.  (Id. at 15-16.)  He noted that it was but a temporary release as Dr. Fumich ultimately released Plaintiff to return to work and, insofar as it is an opinion that Plaintiff could not work for that month, it is an opinion on an issue reserved to the Commissioner.  (Id. at 16.)  The ALJ also gave little weight to the low GAF scores, noting that Plaintiff's mental status examinations were generally within normal limits and were sometimes given when he was under the influence of illicit substances.  (Id. at 16-17.)  Little weight was given to Dr. Ward's functional assessment because Plaintiff was dishonest with him about his substance abuse, misrepresenting that he had been sober for four years.  (Id. at 17.)

Conversely, the ALJ gave significant weight to the opinion of the psychological State agency review consultants.  (Id.)  "[S]ome weight" was given to the physical State agency review physicians.  (Id.)

The ALJ concluded that with his RFC Plaintiff can perform his past relevant work as an auto body helper as he performed it and as described in the DOT.  (Id. at 17-18.)

Plaintiff is not, therefore, disabled within the meaning of the Act.  (Id. at 18.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). A "severe impairment" is "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009) (Moore I). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore I**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore I**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her

burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore v. Astrue**, 623 F.3d 599, 602 (8th Cir. 2010); **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one

of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"

**Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

**Discussion**

Plaintiff argues that the ALJ erred when (1) evaluating his RFC because such assessment was not supported by substantial evidence in that (a) it disregarded Plaintiff's frequent trips to emergency rooms for injections of pain relievers, (b) it disregarded the observations of Dr. Fumich in February 2011[14] and in April 2011 about Plaintiff's pain, and (c) it improperly weighed Dr. Ward's opinion, and (2) determining that Plaintiff can return to past relevant work as an auto body helper.

<u>RFC.</u> "Among the considerations the ALJ takes into account when determining a claimant's RFC is the claimant's subjective complaints of pain." **Perks v. Astrue**, 687 F.3d 1086, 1092 (8th Cir. 2012). Although Plaintiff does not challenge the ALJ's assessment of his credibility,[15] Plaintiff cites his many trips to emergency rooms and injections of pain relievers in support of his complaints of disabling pain. Between February 2006 and March 2011, Plaintiff made twenty trips to an emergency room, eleven of which were before his alleged disability onset date of October 2009. Four trips were for treatment of migraine headaches; three were made before October 2009, one after. With the exception of an administration of Phenergan and morphine when Plaintiff was seen at an emergency room in March 2011 for complaints of left hip and back pain, the cited injections of pain relievers

---

[14]Plaintiff mistakenly identifies the February 2011 record as being that of Dr. Muha.

[15]Were he to do so, any such challenge would be unavailing for the reasons discussed by the Commissioner in her brief in support of her answer. (See Def.'s Br. at 4-9, ECF No. 22.)

were given during treatment of migraines – an impairment not alleged by Plaintiff to be disabling. Two trips were for treatment of left shoulder pain, an allegedly disabling impairment. Both were made before October 2009. The first trip, in January 2007, was caused by Plaintiff being hit by a beam. The diagnosis made in the second trip, in September 2009, was that an infection resulting from Plaintiff wearing a sling was the cause of the pain. Plaintiff made six emergency room trips for treatment of chest pain. Three were made before October 2009; three after. Two of the later three were made the same month; one one day to one emergency room, the second made the day after to another emergency room. Tests taken at each showed bronchitis and possible early pneumonia. Tests taken during the third trip, which occurred five months later, showed no active pulmonary disease. Plaintiff was given a prescription for a pain reliever at this visit, but no injection. The next day, he went to an emergency room at another hospital, and was prescribed only a stool softener and an antibiotic. Plaintiff went to an emergency room once for depression – this was in March 2007 and followed a pattern of drinking until he passed out. The other emergency room trips were for gastric, eye, or infection problems. Thus, contrary to Plaintiff's assertion, his trips to emergency rooms for treatment of various claims of pain do not support his claim that the ALJ's RFC is not supported by substantial evidence. See **Johnson v. Astrue**, 628 F.3d 991, 995-96 (8th Cir. 2011) (question before the ALJ was not whether claimant suffered from pain due to her lupus but was whether the pain was *disabling*).

In support of his argument that the ALJ's RFC assessment is fatally flawed, Plaintiff also cites the references in Dr. Fumich's February 2011 notes to Plaintiff's neck and left arm

pain being made worse by activity and in his April 2011 notes to Plaintiff dropping things, having difficulty with fine motor tasks, and to Plaintiff's symptoms being aggravated by his use of his arms and relieved by rest. The references in both notes, however, are to Plaintiff's reports or history of his symptoms. Dr. Fumich's examination findings are inconsistent with those references. For instance, at the February visit, Plaintiff had no loss of muscle tone or strength in his upper extremities and only a slightly weakened grip in his left hand. At the April visit, although Plaintiff reported he was dropping things and having difficulty with fine motor tasks, his hand grip and finger and wrist extension were fully maintained in his right hand – his dominant hand – and only slightly, i.e., 4/5, lessened in his left hand. The ALJ may properly disregard that portion of a physician's report that is based on the claimant's discredited subjective complaints rather than on objective medical evidence and may discount any conclusions based on those complaints. **Cline v. Colvin**, 771 F.3d 1098, 1104 (8th Cir. 2014); **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013); **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012). <u>See</u> <u>also</u> **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) (rejecting claimant's argument ALJ had improperly ignored portions of treating physician's opinion when the portions were based on claimant's subjective descriptions).

Also, any reliance by Plaintiff on Dr. Fumich's "off work slips" in support of his argument is unavailing. As noted by the ALJ, the releases were temporary and were for a duration defined by anticipated medical procedures, some of which Plaintiff did not pursue. The work Plaintiff was released from was construction work, the requirements of which are not now at issue. Moreover, any inference that the slips were indicative of an inability to

work in a wider range of occupations and on a more permanent basis, they invade the province of the Commissioner. See **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2013) ("A medical source opinion that an applicant is . . . 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").

In his final challenge to the ALJ's RFC findings, Plaintiff argues that the ALJ erred by not giving Dr. Ward's assessment of his abilities more weight and not giving the consulting non-examiners' opinions less weight. Dr. Ward examined Plaintiff in November 2010. Plaintiff informed him that he had been sober for four years. He had not been. Four months earlier, he tested positive for drugs. A year before that, he was using marijuana. And, within the four years, he had a pattern of drinking until he passed out. The ALJ discounted Dr. Ward's assessment on the grounds that it was based on an inaccurate assumption that Plaintiff had not abused alcohol or drugs for four years. This is a reason independent from any analysis of the ALJ of the opinions of the non-examining consultants and is within the reach of the ALJ's duty to determine Plaintiff's RFC.

Past Relevant Work. Plaintiff argues that the ALJ erred in determining that he can return to past relevant work as an auto body helper because the requirements of such a position are inconsistent with the ALJ's RFC determination that he is limited to *occasional* overhead reaching with his left arm. The Commissioner does not dispute the inconsistency between the ALJ's reaching limitation and the DOT's definition of the job, but contends any

inconsistency is irrelevant because the ALJ's finding that Plaintiff can return to past relevant work was made at step four and, consequently, the testimony of a VE was not required.

"Past relevant work is work that [a claimant] [has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [him] to learn to do it." 20 C.F.R. § 416.960(b)(1). The Commissioner's primary consideration when determining whether someone is performing substantial gainful activity is the earnings derived from that activity. 20 C.F.R. § 416.974(a)(1). For the year 2005, when Plaintiff worked as an auto body helper, the average monthly earnings to be considered substantial gainful activity were $830. Substantial Gainful Activity, http://www.socialsecurity.gov/OACT/COLA/sga.html (last visited Feb. 25, 2015). Plaintiff earned $8,896 working in 2005 as an auto body helper. If he worked for ten months or less, this amount is sufficient to be considered substantial gainful activity. If he worked for eleven months or longer, it is insufficient. The only indication in the record, however, of how long he worked is his hearing testimony that he was "pretty sure" it was for at least six months. (R. at 38.)

The regulations further provide that, when determining whether a claimant can return to past relevant work, the Commissioner "may use the services of vocational experts or vocational specialists, or other resources, such as the [DOT] . . . , to obtain evidence . . . need[ed] to help . . . determine whether [the claimant] can do [his] past relevant work, given [his] residual functional capacity." 20 C.F.R. § 416.960(b)(2). The ALJ did use the services of a VE, who testified that a claimant who is able to only occasionally reach overhead with his left arm can perform the job of an auto body repairer helper, DOT 807.687-010. This job

requires frequent, i.e., from one-third to two-thirds of the time, reaching. <u>DOT</u>, 807.687-010, 1991 WL 681529 (4th ed. rev. 1991).

In **<u>Moore v. Colvin</u>**, 769 F.3d 987 (8th Cir. 2014), the plaintiff argued that the ALJ had erred by determining that he could perform two types of work identified by a VE as both requiring frequent reaching when the ALJ's RFC limited him to occasional overhead reaching bilaterally. **<u>Id.</u>** at 989. The court noted that the DOT's listing for each job required frequent reaching without specifying the direction of reaching. **<u>Id.</u>** The court further noted that Social Security Ruling 00-4p requires that an ALJ inquire about any possible conflict between the VE's evidence and the DOT's information and that the "the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information.'" **<u>Id.</u>** at 889-900 (quoting SSR 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000)) (alterations in original). "Absent adequate rebuttal . . . , VE testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely . . . .'" **<u>Id.</u>** at 900 (quoting <u>Kemp v. Colvin</u>, 743 F.3d 630, 632 (8th Cir. 2014)). The court concluded that the VE's added qualification of "clearing tables" to the job of "cafeteria attendant" and her "Yes" response to the question whether her testimony was consistent with the DOT did not adequately explain the inconsistency between the ALJ's RFC and the DOT's description and remanded the case. **<u>Id.</u>** Similarly, in **<u>Kemp</u>**, the court found that the ALJ had not fulfilled his affirmative responsibility to inquire about a possible conflict between the DOT and the VE's evidence when the VE testified that the claimant could perform the work of a

check-weigher although the DOT defined that job as requiring constant reaching and the ALJ limited the claimant to only occasional overhead reaching.  743 F.3d at 632-33.  The VE had offered no explanation for the conflict and the ALJ had not sought one.  **Id.** at 633.

In **Welsh v. Colvin**, 765 F.3d 926 (8th Cir. 2014), cited by the Commissioner, the court rejected an argument that a conflict between the VE's testimony and the DOT listing was insufficiently resolved because "the VE's explanations were based upon insufficient personal experience and unreliable scholarly literature."  **Id.** at 930.  The VE's explanations, given in response to extensive questioning and cross-examination, were that the DOT's description was at the outer limit of what might be required in a particular job and that, based on her experience observing people at work, the job did not require lifting more weight than listed in the RFC.  **Id.** at 928.  The VE also testified that a published survey found that the job at issue could be performed with the limitations in the RFC.  **Id.**  The court concluded that the ALJ had properly inquired into the inconsistency.  **Id.** at 930.

In the instant case, the ALJ inquired only about whether the VE's testimony was "consistent with the DOT and [his] training, education, and experience in the field."  (R. at 65.)  The VE simply replied, "Yes."  (Id.)  As in **Kemp**, 743 F.3d at 633, "the record does not reflect whether the VE or the ALJ even recognized the possible conflict between the hypothetical describing a claimant who could reach overhead only occasionally, and [the] DOT job listing" of 807.687-010 indicating that an auto body repairer helper job required frequent reaching.

The Commissioner seeks to distinguish **Moore** and **Kemp** on the grounds that the relevant issue in those cases arose at step five, not step four as in the instant case. Under the present circumstances, however, the distinction is one without a difference. As noted above, the regulations provide that the services of a VE may be used when determining whether a claimant can perform his past relevant work. See 20 C.F.R. § 416.920(b)(2). The ALJ did so. The ALJ did not adequately inquire into a conflict between the VE's testimony that, even being limited to occasional overheard reaching with his left arm, Plaintiff could perform his past relevant work as an auto body helper and the DOT's description of the job as requiring frequent reaching.

## Conclusion

For the reasons set forth above, the ALJ's RFC findings are supported by substantial evidence on the record as a whole. His findings that Plaintiff had past relevant work as an auto body helper and that he could return to that work with a limitation of being able to only occasionally reach overhead with his left arm are not supported by substantial evidence on the current record. Although the Court is aware "that the ALJ's decision may not change after properly considering [Plaintiff's] . . . past work demands" and "that the ALJ may choose to extend his inquiry through the fifth step and find that [Plaintiff] can perform work other than his past relevant work," see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED

and that this case is REMANDED to the Commissioner for further proceedings as discussed

above.

An appropriate Order of Remand shall accompany this Memorandum and Order.




/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this  26th  day of February, 2015.